IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

TYLER DIVISION

| | | |
|---|---|---|
| ROBERT MARVIN WILLIAMS | § | |
| | § | CIVIL ACTION NO. 6:06cv24 |
| SMITH COUNTY JAIL, ET AL. | § | |

MEMORANDUM OPINION AND ORDER OF DISMISSAL

The Plaintiff Robert Williams, a former inmate of the Smith County Jail, filed this civil rights lawsuit under 42 U.S.C. §1983 complaining of alleged violations of his constitutional rights during his confinement in the jail. The parties have consented to allow the undersigned United States Magistrate Judge to enter final judgment in this proceeding pursuant to 28 U.S.C. 636(c).

An evidentiary hearing was conducted on January 18, 2007, pursuant to Spears v. McCotter, 766 F.2d 179 (5th Cir. 1985). At this hearing and in his complaint, Williams testified that he had suffered a back injury before going into the Smith County Jail, but that on December 25, 2005, he slipped and fell in the jail. He pushed the button, and an officer came, but then left. He saw the nurse the next day.

Williams said that the nurse, whom he identified as "Sonya," became angry and "went off on him." He says that Sonya said that he could be lying, that it could be an old injury, and that "you people are always faking." He believed that her remark about "you people" referred to black persons. He stated that he has medical records showing that he has a torn nerve, and that he has been under a doctor's care and is in pain every day. He complained that he was denied medical care in the jail, but conceded that he saw a doctor a few days after his fall.

Next, Williams said that he sued Sgt. Todd because Todd said that he, Williams, might be lying, and that the nurses at the jail are well trained. Williams replied that the nurses were

1

not back specialists and that they, the nurses, could not say that Williams was not experiencing numbness.  Todd also said that Williams "could be hollering 'wolf,'" but that this was not the case.

Williams testified that he was seeking a doctor in Nacogdoches, whom he most recently saw the week before the hearing.  He said that he has seen the doctor several times, estimating some 10 to 12 times in the past month, and that in the past, he had to pay people to take him to the emergency room, but that he and his wife had bought a car recently.

Williams acknowledged that he had injured his back prior to entering the jail, noting that he told the jailers about the injury when he came in.  He said that he received medications for this injury prior to his December fall, but not on a regular basis.

Next, Williams complained about his wife not being able to visit, but was not clear on this point.  He appeared to say that Sgt. Todd was responsible for this, but did not give a date on which this incident had occurred. Williams also said that when Nurse Sonya went off on him, Todd backed her up.

Sgt. Charles Todd, a Smith County jailer, testified that one of his jobs was to answer inmate request forms.  He said that this was a job delegated to the shift supervisors, of which he was one, and that he only answered the requests which came to him.  Williams argued that in backing up Sonya, Todd was "being prejudiced," but Todd denied this; Todd stated that he was not a "medical person" and so he would naturally defer to a nurse.

Sharon White, a nurse at the Smith County Jail, testified concerning the contents of Williams' medical records.  Nurse White made clear that she was not at the jail when the incidents occurred, and did not even work there then, and so she was only testifying as to the records and not to any personal knowledge.

According to Nurse White, when Williams entered the jail, he reported a back injury and heart trouble.  During his first ten days in the jail, he complained of back pain and of the flu.  On one occasion, she said, he threatened suicide and was put on a suicide watch for four to five days.

On December 26, 2005, Nurse White said that the medical records show that Williams was found laying face down on the floor, in a non-responsive state. He responded easily to ammonia inhalers but complained of chest pain. Williams stated that he could not take being put in a side cell, and that he could not talk to anyone or see anyone. He said that he was missing his family but said that he would not kill himself; Williams stated that he realized that he was depressed and "needed to see someone." Because Williams was responsive and able to talk, Nurse White said, she did not believe that he was experiencing a cardiac incident.

Nurse White stated that according to the medical records, Williams was treated with a pain medication called Motrin after his fall. The examining nurse believed that he was suffering from an old injury, but Williams told her that it was a new one. He was put on the list to see the doctor and had an appointment on December 28. Nurse White said that the treatment which he received for his back was normal. She said that everyone, even people in the free world, experienced delays in obtaining medical care.

Williams reiterated that he did not get proper medical care, saying that an MRI showed that there was something torn in his back. He asked White how a nurse could tell him that he was not in pain, and White said that normally, when a patient tells the nurse that he is in pain, the nurse assumes that he is in pain. Williams stated that there was nothing torn in his back before, but there is now.

Williams testified that the fall itself was not part of his claim, and that his lawsuit involved the treatment which he received after the fall. He offered some records to the Court, and stated that he would furnish a copy.

Documents furnished by Williams show that on January 3, 2007, he had a series of medical procedures done, which included the taking of readings from his spinal area through radiographic images, followed by a percutaneous radio-frequency neuro-ablation of the dorsal ramus

of the medical branch at right L-4, L-5, and S-1 (which are three areas of the lower back).[1]  Other documents furnished by Williams show that he had been seeing physicians in Nacogdoches, over a considerable period of time, for pain management since an on-the-job injury which he suffered while lifting pallets, and that he had a prior herniated disc.

The Smith County jail records show that at the time that he was booked in, he advised medical personnel that he had a work-related back injury and was on medications.  The clinic notes show that on October 13, 2005, he told medical personnel that he had a history of back problems and was prescribed a pain medication called naproxyn.  On October 23, he was prescribed Motrin, in 800 mg doses.  On October 31, Williams went to the clinic complaining of chest pain and pain down his right arm; he said at that time that he had a pinched nerve in his neck.  He was issued Motrin and a muscle relaxant called Robaxin.  On November 4, however, Williams complained that his medication "did not work."

On December 2, 2005, Williams saw the physician and told him that he had two bulging discs and a pinched nerve.  The doctor noted that he would obtain Williams' medical records from the free world

On December 26, the medical records state that Williams was found laying on the floor, face down and non-responsive.  He did respond to an ammonia inhaler, and complained of chest pain.  His blood pressure was 110/80, his pulse was 88, and his respirations were 86.  The medical staff used a paper bag to lower his respiration rate, and when this was done, Williams told the medical staff that he could not take the side cell because he could not see anyone or speak to anyone, He said that he was missing his family but that he would not kill himself, although he realizes that he is depressed and needs to see someone.

The next day, an entry in the medical records says that when Williams was in the clinic, he said that he had fallen on Christmas Day and that his back was hurting.  The nurse noted

---

[1] Radiofrequency neuroablation is the destruction of nerves which carry pain signals to the brain.  It is generally considered a last resort, used when other means of treatment have failed.  *See* http://www.medtronic.com/neuro/ttp/treatment.html#neuroablation.

that after going over the chart, she determined that it was an old injury.  She called Williams to the clinic, and according to the nurse's entry, Williams told her that he did not say that it was a new injury and that he figured that they would know that it was an old injury; this nurse talked to the day nurse and she said that she did not know anything about him falling on Christmas Day.  Furthermore, there was no documentation to show a fall; the nurse wrote that she would put Williams on the list to see the doctor.

On December 28, Williams did see the doctor, who found mild swelling on his back and some tenderness in the L3 (middle of the lower back) region.  He ordered X-rays and gave Williams a prescription for Motrin 800mg.  These X-rays were done on January 5, 2006, and showed no evidence of acute lumbar spine fractire or subluxation, but only mild degenerative facet changes (bilaterally) at L5-S1 and minimal endplate spurring at T12-L1.

On January 16, 2006, Williams again saw the doctor, complaining of a backache.  The doctor found mild swelling in the L2 area and said "likely osteophyte" (i.e. a bone spur).  No tenderness or neurological problems with his legs were found, and the doctor prescribed medications called Ultram and neurontin.

On December 26, 2005, Williams filed a sick call request saying that he needed something for pain and that he has not received proper medical care.  The next day, he filed a sick call request saying that he is hurting and experiencing numbness, and asking for pain medication.  The response was that he had been seen in the clinic.  Later that same day, he wrote a sick call request saying that he was hurting and experiencing numbness, and complaining in general about the medical care provided.  The response was that he was on the list to see the doctor.

On December 29, Williams filed a sick call request asking when he would get X-rays and would he have to pay anything, and the response was that they could not give him this information but that he would be called.  That same day, he wrote another sick call request asking about ice packs, and the response was that he had seen the doctor the day before and ice packs were not ordered.  On January 6, 2006, he filed a sick call request saying that he was almost out of

5

medications, and the response was that he had been seen.  The next day, Williams filed a sick call request saying that he was out of pain medication, and the response was that Motrin 800mg had been ordered.

On January 11, Williams wrote a sick call request asking to see the doctor, and the response was that he was on the doctor's list.  On January 14, he wrote a sick call request saying that he was hurting and having numbness and muscle spasms, and the response was that he was on the list to see the doctor and that the X-rays showed no fracture; Motrin 200mg had been issued, On January 19, Williams filed a sick call request saying that he was almost out of pain medication, and the response was that medications were issued.

The evidence at the Spears hearing showed that sick call requests were different from inmate request forms.  On December 26, 2005, Williams filed an inmate request form asking about his property, his court date, and saying that he needs medical care and X-rays of his back.  The response, from Sgt. Harris, noted that he had spoken to the nurse and ascertained that Williams was on the list to see the doctor.  That same day, Williams filed three other inmate request forms, saying that he needed medical care because he had fallen the day before, and now he has a "knot" in his back.  He was again told that he was on the list to see the doctor.

On December 27, 2005, Williams filed an inmate request form saying that he had been called to see the nurse and she "went off" on him, saying that he had been complaining about his back for a while.  Williams says that the nurse told him that his pain could be from his old injury at work, when it is a new injury that he just suffered.  Williams says that if he has to go the lieutenant, he will, and that he is "fed up." On December 29, Williams wrote an inmate request form asking for ice packs, but was told that it had to be ordered before the medical staff could provide it.

Legal Standards and Analysis

Williams' primary complaint concerns the medical care which he received in the Smith County Jail. At the time of the incidents in question, Williams was a pre-trial detainee, and so his rights flow from the Due Process Clause of the Fourteenth Amendment.  Hare v. City of

Corinth, 74 F.3d 633, 639 (5th Cir. 1996) (*en banc*).  The Fifth Circuit has held that the duty owed to pre-trial detainees is measured under the subjective definition of deliberate indifference; thus, to prevail on a Section 1983 claim against a jail official with regard to an episodic act or omission, the detainee must show that the defendant had subjective knowledge of a substantial risk of serious harm to the detainee, but responded with deliberate indifference to that risk.  Hare, 74 F.3d at 650.  The Fifth Circuit has observed that mere negligence will not suffice, and deliberate indifference cannot be inferred from a failure to act reasonably.  Wagner v. Bay City, Texas, 227 F.3d 316, 324 (5th Cir. 2000) (citing Hare).

        In addition, the Fifth Circuit has noted that simple disagreement with the medical treatment received or a complaint that the treatment received has been unsuccessful is insufficient to set forth a constitutional violation.  Norton v. Dimazana, 122 F.3d 286, 291 (5th Cir. 1997); Johnson v. Treen, 759 F.2d 1236, 1238 (5th Cir. 1985).  As the Court explained in Hare, negligent or mistaken medical treatment or judgment does not implicate the Eighth Amendment and does not provide the basis for a civil rights action.  Graves v. Hampton, 1 F.3d 315, 319-20 (5th Cir. 1993). The Fifth Circuit has held that the fact that medical care given is not the best that money can buy, and the fact that a dose of medication may occasionally be forgotten, does not amount to deliberate indifference to serious medical needs.  Mayweather v. Foti, 958 F.2d 91 (5th Cir. 1992).

        More pertinently, the Fifth Circuit has held that an inmate who had been examined by medical personnel on numerous occasions failed to set forth a valid showing of deliberate indifference to serious medical needs.  Spears v. McCotter, 766 F.2d 179, 181 (5th Cir. 1985).  It should be noted in this regard that medical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference to serious medical needs. Banuelos v. McFarland, 41 F.3d 232, 235 (5th Cir. 1995).

        In Domino v. TDCJ-ID, 239 F.3d 752 (5th Cir. 2001), a inmate who was a psychiatric patient expressed suicidal ideations and the psychiatrist returned him to his cell after a five-minute

examination; the inmate committed suicide two and a half hours later. The Fifth Circuit, in reversing a denial of summary judgment by the district court, stated as follows:

> Deliberate indifference is an extremely high standard to meet. It is indisputable that an incorrect diagnosis by prison medical personnel does not suffice to state a claim for deliberate indifference. Johnson v. Treen, 759 F.2d 1236, 1238 (5th Cir. 1985). Rather, the plaintiff must show that the officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." Id. Furthermore, the decision whether to provide additional medical treatment "is a classic example of a matter for medical judgment." Estelle v. Gamble, 429 U.S. 97, 107 (1972). And, "the failure to alleviate a significant risk that [the official] should have perceived, but did not," is insufficient to show deliberate indifference. Farmer v. Brennan, 511 U.S. 825, 838 (1994).

Domino, 239 F.3d at 756; *see also* Stewart v. Murphy, 174 F.3d 530, 534 (5th Cir. 1999).

In the present case, Williams has failed to show that the jail officials were deliberately indifferent to his medical needs. He was seen by a physician a few days after he fell, pain medication was provided for him, and X-rays were ordered. These X-rays showed that Williams had not suffered a fracture, and no subluxation (i.e. a moving out of position by the bones of the spine) was evident, but Williams was provided with additional pain medication as well as a muscle relaxant often used to treat pain, including back pain. The fact that the treatment was not as successful as Williams would have liked is not proof of deliberate indifference. *See* Mayweather v. Foti, 958 F.2d at 91 (noting that while continuing back pain is "unpleasant," its existence does not in and of itself demonstrate that a constitutional violation has occurred).

Williams strenuously complains about the conduct of the nurse, whom he identifies as "Sonya." While it is not entirely clear, the medical records seem to indicate that he is referring to Nurse Sondra Winthrop, to whom he spoke on December 27. Williams stated that the nurse said that he could be lying, that it could be an old injury, and that "you people are always faking."

The Court takes Williams' assertions as true at this stage of the proceeding, and under this assumption, it is obvious that the nurse's comments were improper and uncalled-for. However, this does not mean that a constitutional violation occurred. *See generally* Bender v. Brumley, 1 F.3d 271, 274 n.3 (5th Cir. 1993) ("mere threatening language and gestures" by correctional officers are

not constitutional violations; Johnson v. Glick, 481 F.2d 1028, 1033 n.7 (2nd Cir. 1973) (use of words, "no matter how violent," does not comprise a section 1983 violation). Despite the nurse's intemperate remarks, the record shows that Williams was not denied medical care. His claim on this point is without merit.

Williams also sues Sgt. Todd, complaining that he "backed up" the nurse after what she said to Williams. However, Todd, as a jail sergeant, does not supervise the Smith County Jail nursing staff, and so it is unclear what action he could have taken even had he wanted to. Furthermore, even if Sgt. Todd did have supervisory power over the nurse, Williams has failed to show that Todd violated his constitutional rights, because he has not shown that the nurse did so. *See* Gibbs v. King, 779 F.2d 1040, 1046 n.6 (5th Cir.), *cert. denied* 476 U.S. 1117 (1986) (absent primary liability, there can be no supervisory liability); Doe v. Taylor Independent School District, 15 F.3d 443, 452-53 (5th Cir. 1994) (in cases involving failure to train or supervise, the plaintiff must show (1) an actual failure to train or supervise, (2) a causal connection between this failure and the violation of his rights, and (3) that the failure amounted to gross negligence or deliberate indifference). The fact that Todd told Williams that the nursing staff was medically trained and he (Todd) was not, so he had to defer to their judgment, is not a constitutional violation.

At the Spears hearing, Williams referred to an incident in which Sgt. Todd had apparently denied him visitation privileges with his wife on some unknown date, but offered no factual details concerning this. The Fifth Circuit has held that civil rights claimants must state specific facts, not conclusory allegations. Brinkmann v. Johnston, 793 F.2d 111, 113 (5th Cir. 1986); *see also* Baker v. Putnal, 75 F.3d 190, 195 (5th Cir. 1996) (Section 1983 actions against individual governmental officials require "claims of specific conduct and action giving rise to a constitutional violation," not merely conclusory assertions). Furthermore, even assuming that Williams, as a pre-trial detainee, had a constitutional right to visitation, the denial of a single visit would not run afoul of such a right. *Cf.* Berry v. Brady, 192 F.3d 504, 508 (convicted inmates). Williams' claim on this point is without merit.

Finally, Williams sued an unknown jail official, whom he says saw him after he fell, but just "walked away." As noted above, Williams indicated that he was not suing about the fall itself. To the extent that he did intend to sue this official, however, his claim is without merit.

The Supreme Court has specifically addressed the issue of deliberate indifference to an inmate's safety. The Court explained that

> [A] prison official cannot be held liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. ...
>
> But an official's failure to alleviate a significant risk which he should have perceived, but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.

Farmer v. Brennan, 511 U.S. 825, 837-38, 114 S.Ct. 1970, 1979 (1994); see Hare, 74 F.3d ay 639 (applying Farmer standard).

In this case, Williams has not shown that the unknown official who saw him after he fell knew of and disregarded an excessive risk to his safety, rather than simply being negligent or careless. The only evidence he provided about this officer was that he, the officer, "looked at me and walked away." As the Supreme Court explained, an officer's failure to alleviate a risk which he should have perceived, but did not, is "no cause for commendation," but is not a constitutional violation. See also Bowie v. Procunier, 808 F.2d 1142, 1143 (5th Cir. 1987) (negligence, even when resulting in serious injury, is not a constitutional claim). This claim is without merit.

Conclusion

28 U.S.C. §1915A requires that as soon as practicable, district courts must review complaints wherein prisoners seek redress from governmental entities or their employees. Section 1915A(b) requires that upon review, the court shall identify cognizable claims or dismiss the complaint or any portion thereof if the complaint is frivolous, malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief.

The term "frivolous" means that a complaint lacks an arguable basis in law or fact; a complaint is legally frivolous when it is based upon an indisputably meritless legal theory. Neitzke v. Williams, 490 U.S. 319, 325-7 (1989). A complaint fails to state a claim upon which relief may be granted if as a matter of law, it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. Neitzke v. Williams, 490 U.S. 319, 327, (1989), *citing* Hishon v. King & Spalding, 467 U.S. 69, 73 (1984); *see also* Blackburn v. City of Marshall, 42 F.3d 925, 931 (5th Cir. 1995).

In this case, Williams' complaint lacks any arguable basis in law and fails to state a claim upon which relief may be granted. Consequently, his lawsuit may be dismissed as frivolous under 28 U.S.C. §1915A(b). *See generally* Thompson v. Patteson, 985 F.2d 202 (5th Cir. 1993). It is accordingly

ORDERED that the above-styled civil action be and hereby is DISMISSED with prejudice as frivolous. 28 U.S.C. §1915A(b). It is further

ORDERED that any and all motions which may be pending in this civil action are hereby DENIED.

**So ORDERED and SIGNED this 14th day of February, 2007.**

_____
JOHN D. LOVE
UNITED STATES MAGISTRATE JUDGE